## MATTER OF AWADALLA

### In VISA PETITION Proceedings

### A-12935982

*Decided by Board May 28, 1964*

An unauthenticated Jordanian judgment of divorce obtained *in absentia* by the wife in Jordan while the husband was in Colombia lacks essential proof of due process for recognition as valid in Puerto Rico for the purposes of a subsequent marriage in that jurisdiction since neither party was before the court, there were no witnesses, and the court apparently considered no evidence except the *ex parte* statements of plaintiff/wife's attorney and assumed defendant/husband's concurrence because of his absence. Consequently, the subsequent marriage of the husband in Puerto Rico to a native and citizen thereof is not valid for immigration purposes and does not serve to confer nonquota status.

The district director denied this visa petition on the ground that the evidence fails to establish sufficiently that petitioner and beneficiary are validly married. He certified the case to us for final decision. Except for one point, the reasons underlying our decision differ completely from those on which the district director relies. We reach the same conclusion, however. Therefore we affirm the district director's order.

Beneficiary is a 43-year-old native and national of Jordan of the Islamic faith. He entered the United States on June 14, 1961, at San Juan, Puerto Rico as a visitor. Prior to that entry he resided in Colombia for about a year and a half.

Beneficiary was married in Jordan. He says that in October of 1960 he was divorced in Jordan from his Jordanian wife. Six children of that marriage—four girls and two boys—live in Jordan.

Petitioner married the beneficiary at San Juan, Puerto Rico, on September 29, 1961. She is a native of Puerto Rico, 50 years old, who has not been previously married.

The petition was filed on December 20, 1961, and has been before us twice prior to this certification. Originally, petitioner submitted a declaration by beneficiary's Jordanian wife. That declaration states in Arabic and English that beneficiary has been declarant's lawful

580

husband, that he divorced her on the 11th day of October 1960, that he left her from that date, and that there has been no relation between them at all after that date. Both the Arabic and English versions contain an obvious erasure in the year of divorce.

The district director had the Federal Bureau of Investigation's laboratory examine the document. The laboratory on March 14, 1962, reported that the original date on the English version has been changed from 1961 to 1960 and that the "1" on the typewriter making the change differed from the "1's" on the document. The laboratory also reported that the last digit in the year in the typewritten Arabic text has been erased and an Arabic "0" written in ink. The laboratory could not determine the erased character.

Apparently the Service either had checked on the document before submitting it to the Federal Bureau of Investigation or had information on the results of the laboratory findings before receiving the formal report. In a sworn statement taken almost two months before the Federal Bureau of Investigation's report, a Service officer confronted beneficiary with the information that the declaration had been altered. The officer said experts on documents had determined the year of the divorce had been changed from 1961 to 1960. Beneficiary denied any changes had been made in the document.

The district director initially held petitioner had failed to establish that her marriage to beneficiary occurred subsequent to his divorce. He based his conclusion on the evidence that the date of petitioner's marriage, September 29, 1961, preceded the date October 11, 1961, originally given for the divorce on the declaration. Petitioner appealed from that decision, but offered nothing to rebut the evidence of the erasure and alteration on the declaration. Our decision of September 28, 1962, upheld the district director's analysis of the evidence.

Subsequently petitioner submitted directly to us a "Court Notice in Absentia" by the Qadi of Ramallah, a religious judge, which confirmed that beneficiary divorced his Jordanian wife on October 11, 1960. On October 26, 1962, we certified the case to ourselves, withdrew our order of September 28, 1962, reopened the proceedings, remanded the case to the district director for consideration of the new evidence, and directed the district director to certify the case to us for review if his decision were adverse. The district director again denied the petition bringing the case to its present posture.

The district director contends that the later evidence of the court notice does not alter the fact that the year of divorce was changed from 1961 to 1960 on the declaration originally submitted. He asserts that the court notice, issued on September 9, 1962, granted a retroactive divorce to the wife. He concludes, therefore, that beneficiary and his

Jordanian wife were not finally divorced until September 9, 1962, because the retroactive effect of that divorce should be disregarded. Thus, he argues that the divorce granted by the Qadi of Ramallah failed to cure the invalidity of petitioner's marriage to the beneficiary.

Counsel for petitioner, in his brief in opposition to the district director's decision, argues that the change in the date on the declaration merely corrected a clerical error. In any event, he contends, the judgment of the Court of Ramallah establishes that beneficiary was divorced in October of 1960.

The district director and petitioner's counsel each recognize the basic issue—the validity of the marriage performed on September 29, 1961, at San Juan, Puerto Rico, between petitioner and beneficiary.

In this proceeding petitioner has the burden of establishing the validity of the relationship upon which the petition is based. Therefore, the rule presuming validity of the most recent marriage has no applicability here.[1] Ordinarily, we follow the general rule that the validity of a marriage depends upon the law of the place where the marriage was contracted.[2] We shall consider the validity of the marriage here under the law of Puerto Rico wherever that law is applicable.

Several questions arise under the primary issue here, however. We shall consider first the one which has primarily occupied the parties up to this point.

### I. The effect of the alteration of the date of divorce in beneficiary's Jordanian wife's declaration

Close examination of the declaration executed before the Mukhtar of Ein Yabroud village by beneficiary's Jordanian wife reveals that the Service's theory of this case has been erroneous from the begin-

---

[1] *Matter of T—S—Y—*, 7 I. & N. Dec. 582, cf. *Petition of Sam Hoo*, 63 F. Supp. 439 (N.D. Calif., 1945) ; *Petition of Lujan*, 144 F. Supp. 150 (Guam, 1956).

A second marriage has been presumed valid in a deportation proceeding in which the burden of proof was on the Government. The Government charged deportability on the ground of bigamy. *U.S. ex rel. Kazanos* v. *Murff*, 170 F. Supp. 182 (S.D. N.Y., 1959). (*Matter of T—S—Y—*, *supra*, arose in deportation proceedings but the issue was respondent's eligibility for preexamination.)

The Supreme Court of Oklahoma has held that where the right of a party to the relief sought depends upon a marriage, either ceremonial or common law, the burden is upon that party to establish the facts essential to constitute the marriage. *Hawkins* v. *Hitchock*, 365 P. 2d 971 (1961)—petition for letters of administration.

[2] The Acting Attorney General so ruled in *Matter of P—*, 4 I. & N. Dec. 610. That decision arose under prior law but also applies to the Immigration and Nationality Act. *Matter of Koehne*, Int. Dec. No. 1282.

Circumstances under which we have departed from this rule are not present here. See, for example, *Matter of G—*, 6 I. & N. Dec. 337; *Matter of Napello*, Int. Dec. No. 1303.

ning. The declaration bears on its face evidence which demonstrates conclusively that the divorce to which the document refers could not have occurred in October of 1961. A rubber stamp impression in Arabic, which authenticates the signature of the district governor, bears the date of February 22 and a year which, although somewhat indistinct, is either 1960 or 1961. The revenue stamp affixed to the document distinctly bears the date February 22, 1961, written upon it. Thus, the declaration was executed prior to beneficiary's marriage in Puerto Rico. Obviously, when the document was originally prepared, the year in which the document was executed was used erroneously for the year of the divorce. Later, the dates in the Arabic and English texts were changed to correct that error.

Although there is actually no conflict as to the date of divorce between the declaration and beneficiary's testimony, the record does contain serious conflicts. The district director's opinion says that whether beneficiary renounced his first wife at all is highly questionable. That is the one point in his opinion with which we agree. Certainly, beneficiary's own testimony casts doubt upon the fact of his divorce.

II. Effect of evidentiary conflicts in beneficiary's testimony, his Jordanian wife's declaration, and the Court Notice in Absentia, taking such evidence at face value

According to beneficiary's Jordanian wife's declaration—confirmed by the Qadi's court notice—beneficiary exercised his right under Moslem law to divorce his wife, unilaterally, by declaring to her that she was divorced from him.[3] Apparently he made a single statement, which, under certain conditions, he could revoke.[4] Apparently, also, there were no witnesses to the divorce. Moslem law does not require witnesses or any particular procedure, although the husband may, if he desires, declare his divorce under more formal circumstances than in beneficiary's case. Jordan recognizes Moslem law as the personal law of a Moslem.

The district director notes that, although petitioner presented the declaration of the Jordanian wife and the Court Notice in Absentia as evidence that beneficiary divorced his first wife, beneficiary says that his Jordanian wife divorced him.[5] The immigration officer who

---

[3] The wife evidently made the declaration to comply with the Palestinian Law of Marriage and Divorce Registration, of July 23, 1919, which is in force in beneficiary's area in Jordan.

[4] See Appendix "A."

[5] Petitioner's counsel refers to the declaration and court notice as evidence that the beneficiary was divorced from his first wife but does not discuss the discrepancy between beneficiary's statements that his wife divorced him and the statement in the documents that beneficiary divorced his wife.

took beneficiary's statement had the declaration before him at the time but failed to call beneficiary's attention to his wife's statements that he divorced her.

The question who divorced whom ordinarily would not be important to us so long as we were satisfied a divorce occurred. That question, however, becomes important to the issue whether a divorce under Moslem law occurred at all. A wife in Jordan may divorce her husband if he delegates to her the right of divorce. In the absence of such right, she can, in certain circumstances, request a divorce from a religious judge.

There is no evidence that the wife received a judicial divorce on October 11, 1960—the date both parties say the divorce occurred.[6] Therefore, unless beneficiary had specifically delegated to his Jordanian wife the right of divorce, he would have had to be the moving party in a divorce which occurred in the manner here set forth. There is also no evidence here of any such delegation. In these circumstances, beneficiary's denial that he divorced his wife raises a serious question whether the divorce occurred at all.

Beneficiary's Jordanian wife's declaration does not show whether beneficiary was in the village at the time of the divorce. The language in both the Arabic and English versions is consistent with either his presence or absence.

The court notice does indicate that beneficiary came to this hemisphere after divorcing his wife.[7] The judge, however, appears to have merely repeated what the wife's lawyer told him. Therefore, it is possible the statement of facts in the court notice does not accurately reflect all of the details.

Beneficiary's sworn statement of January 26, 1962, contains confusing information. According to that statement, beneficiary was in Colombia for a year and a half before entering Puerto Rico in June

---

[6] Beneficiary says that his wife sent him "a paper from the court," referring to the declaration. The declaration became an official record under Jordanian law through registration. It is not a judicial document, however.

[7] The translation given in the record reads in part:

Since the claimant Amira claimed through her lawyer that the accused Awadallah *in absentia*, whose place of residence is unknown and whom has been decided to be judged in the courts *in absentia*, was her husband and carried with her marital relations, according to the Islamic Religion, and divorced her at her village, Ein Yabroud, on the 11th of October 1960, by telling her (You are divorced from me) and abstained *thereafter* from marital relations, and *departed to an unknown destination in the United States*, requested the confirmation of divorce. (Emphasis supplied.)

This version of the Arabic text is somewhat ambiguous, since it is not clear whether "thereafter" modifies "departed" as well as "abstained." The critical portion of the original text may be translated more accurately, however, to read:

* * * After he divorced her, he left for an unknown place * * *.

of 1961. On that basis, he would have left Jordan in about December of 1959 or January 1960. The immigration officer who took the statement referred to beneficiary's presentation of an air line ticket from Avianca (Colombian Airlines) for round-trip transportation from Beirut to San Juan and return. The record does not show where or when the ticket was issued or whether any of the transportation covered thereby had been used. Thus, the possibility arises that beneficiary had returned to the Near East after he took up residence in Colombia.[8]

The evidence that the declaration was executed in February of 1961 conflicts with beneficiary's testimony that he received that document six, seven, or eight months after he arrived in Colombia, or about June to August 1960, if his statement about 18 months' residence in Colombia is accurate. Thus, either some of beneficiary's statements are in error or the facts are not as he represents them.

As the record now stands, however, we find that beneficiary was in Colombia at the time the divorce is said to have occurred. Under Jordanian law beneficiary could have divorced his wife by a unilateral pronouncement of divorce in Colombia. Beneficiary, of course, denies that he divorced his wife at all, but the record otherwise discredits that statement. As we have seen, both the documentary evidence and the circumstances here refute beneficiary's statement that his Jordanian wife divorced him. Therefore, the evidence is inconclusive on the question whether an absentee divorce occurred.

In view of the discrepancies in the record and the highly informal circumstances under which the alleged divorce occurred, however, the possibility arises that beneficiary did repudiate his Jordanian wife after coming to this hemisphere and then arranged with her to pre-

---

[8] The record does not contain any information from beneficiary's passport showing where and when he obtained his Colombian visa, departures from or entries into any country, or the place and date of issuance of his nonimmigrant visa for this country. Avianca operates to Europe via San Juan. Perhaps the officer misstated the information on the ticket. It may have read Bogota to Beirut (with a connecting carrier) via San Juan and return or simply Bogota to San Juan and return. Either of these situations would fit more logically into beneficiary's testimony. Moreover, beneficiary also presented a reentry permit issued on May 4, 1961, by the "Ministerio de Relaciones Exteriores." The immigration officer did not note the country of issuance, but presumably it was Colombia. Thus beneficiary's round-trip ticket could be expected to provide transportation to that country.

Although we think it unlikely, the ticket may have covered the beneficiary's initial trip from the Near East to this hemisphere. In that event the destination instead of Puerto Rico should have been Colombia. Another possibility, but one which we also think unlikely, is that beneficiary had previously returned to the Near East and in June of 1961 had traveled from Beirut to San Juan with a ticket providing for return transportation to Beirut.

pare the declaration showing their status as divorced.[9]   On the basis of this record, we believe that if the divorce occurred at all it probably occurred under these circumstances.

If by any chance, however, beneficiary divorced his wife by a single pronouncement of repudiation while he was in the village in Jordan, the record also raises a question on the finality of the divorce under Jordanian law.   Beneficiary said in his sworn statement that he wrote to his Jordanian wife, presumably from Colombia, asking her to join him.   Attempts by beneficiary at reconciliation, if they occurred during the *idda* period, would nullify such a repudiation.[10]

Thus, this highly unsatisfactory record does not establish that a divorce under Moslem law occurred at all.   If, however, such a divorce did occur, we find that it was an absentee divorce pronounced in Colombia.   A Moslem divorce pronounced in a jurisdiction which does not ordinarily apply Moslem law raises a serious question of its validity.[11]   In the unlikely possibility a divorce occurred while beneficiary was in Jordan, the record does not establish that the divorce is final and valid under Jordanian law.

Moreover, for reasons other than conflicting statements, we, accord little or no weight to the Jordanian wife's declaration and no weight to the court notice.   Deficiencies in those documents further strengthen our conclusion that the record fails to establish a valid divorce.

### III. Evaluation of the documentary evidence of divorce

We have shown that beneficiary's testimony conflicts in certain particulars with documentary evidence submitted by petitioner.   We now consider the effect of that documentary evidence apart from any such conflict.   Solely for purposes of discussing that effect, we shall assume that Puerto Rico would recognize a divorce pronounced under the circumstances alleged here.

Regardless of objections which might be raised against beneficiary's Jordanian wife's declaration as unsworn, hearsay, or lacking proper authentication, we may accept it for our purposes for whatever probative value we might attach to it.   We should then consider it simply as a statement by the wife, divesting it of any official character.

That document would probably not be acceptable under Puerto Rican law, however.   Apart from any question of lack of proper

---

[9] The Palestinian Law of Marriage and Divorce Registration, adopted by Jordan, does not prescribe any particular formalities for the registration.   *Supra* [1]

[10] See Appendix "A."   (*Idda* is the period during which a woman is prohibited from remarrying after dissolution of a marriage, *i.e.*, the period of waiting for ascertainment of pregnancy.)

[11] Compare *Matter of M—*, 7 I. & N. Dec. 556.   See also *Shikoh* v. *Murff*, 257 F. 2d 306 (C.A. 2, 1958).

authentication and hearsay, the Code of Civil Procedure of 1933 contains specific provisions for conditions under which affidavits may be used.[12] The use for which petitioner offers the declaration is not included.[13] In all cases not covered by the provisions for use of affidavits, a written declaration under oath must be a deposition as prescribed by the Code.[14] The Puerto Rican Rules of Civil Procedure of 1958 have preserved the provisions of the Code of Civil Procedure of 1933 pertaining to affidavits and depositions.

The Court Notice in Absentia handed down on September 9, 1962, by the religious court at Ramallah has in Jordan the effect of a judgment. The district director, as we have seen, contends that, even assuming beneficiary divorced his Jordanian wife on October 11, 1960, beneficiary was not free to marry petitioner at the time of their marriage because the divorce did not become final until the court's action in 1962. The district director believes that the court attempted to grant a retroactive divorce to beneficiary's first wife. He argues that the retroactive effect of the judgment should be disregarded. On the other hand, petitioner's counsel argues that the judgment of the Qadi is similar to an appellate court's judgment affirming a decree of divorce. He says the decree would become final as of the time the lower court decision would be final in absence of an appeal.

Neither of these views correctly applies Jordanian law. The judgment is not in any way a judgment or decree of divorce and does not attempt to grant a retroactive divorce. It merely confirms a divorced status which it recognizes already exists. Taking the facts as the court found them, the divorce became final as to both parties when the *idda* period elapsed without a resumption of the marital status. Assuming that the divorce could be satisfactorily established, it already had full legal effect in Jordan.

Therefore, petitioner's counsel's contention that the Qadi's judgment does not affect the date upon which the divorce became final is correct, although his analogy to an appealed judgment of divorce is inappropriate. There has never been any decree of divorce here. The reli-

[12] Sec. 490, 32 L.P.R.A. Sec. 2061. That provision derived from the Act of March 9, 1905 and Calif. Code of Civil Proc., Sec. 2009.

Although the declaration registers the divorce under Jordanian law, it is, for our purposes, more in the nature of an affidavit. Even though unsworn the document might be given the effect of an affidavit, if its official character were recognized.

[13] California law at the time of adoption of the Puerto Rican Code provided that Sec. 2009 applies only to matters of procedure and has no relation to proof of facts necessary to establish a fact in sustaining a cause of action. *Lacrabere v. Wise*, 141 Cal. 554, 75 P. 185 (1904). This case still represents California law.

[14] Code of Civil Proc., 1933, Sec. 496, 32 L.P.R.A. Sec. 2081. (Calif. Code of Civil Proc., Sec. 2019.

gious court did not review any divorce proceedings, but merely determined for its purposes that a divorce had occurred as alleged.

We consider the authenticity of the Qadi's judgment has not been established sufficiently for us to consider it as official evidence of beneficiary's status as a divorced person.[15] The judgment of the religious judge has not been authenticated in a manner acceptable in Federal judicial proceedings.[16] The certification of our vice consul in Jerusalem is merely an acknowledgment of execution of the translation of the document. It serves to identify the translator. There is nothing to authenticate the signature of the judge or to certify that he is the official custodian of the record. Although the Federal Rules do not control our proceedings, we may be guided by them.

The Puerto Rican Rules of Civil Procedure of 1943 contained a Rule 44 identical, except for one slight variation, with Federal Rule 44. That rule was not continued in the 1958 edition of the Puerto Rican Rules. Section 431.8 of the Code of Civil Procedure remains in effect, however.[17] That section prescribes a form of authentication similar to the provisions of Rule 44. Thus the evidence of the judgment of the religious court in Ramallah is unacceptable in its present form for our purposes and probably would be unacceptable as evidence in a judicial proceeding in Puerto Rico.[18]

Even if the evidence of this judgment were in proper form, however, more fundamental objections to its evidentiary value arise. Neither of the parties were before the court. Beneficiary's Jordanian wife appeared only by her attorney. The judgment itself is described as a notice in absentia as to the defendant and recites that he had departed to an unknown destination in the United States. Service of the defendant was by publication only, probably by posting a notice at the

---

[15] Cf. *Chung Young Chew* v. *Boyd,* 309 F. 2d 857 (C.A. 9, 1062) ; *Yaich* v. *U.S.*, 283 F. 2d 613 (C.A. 9, 1960) ; *U.S.* v. *Grabina*, 119 F. 2d 863 (C.A. 2, 1941) ; *Balazinski* v. *Lebid*, 65 N.J. Super. 483, 168 A. 2d (1961).

Our order which, because of petitioner's submission of the Court Notice in Absentia, remanded these proceedings antedated the decision in *Chung Young Chew.*

[16] F.R.C.P. Rule 44. 28 USC 1741.

[17] * * * Documents of any other class in a foreign country by the original or by a copy, certified by the legal keeper thereof, under, his seal if he has one, with a certificate of the minister or ambassador, or a consul, vice consul, or consular agent of the United States in such foreign country, to the effect that the document is a valid and subsisting document of such country, and that the copy is duly certified by the officer having the custody of the original. 32 L.P.R.A. Sec. 1803.8.

[18] We might consider evidence of this type, however, even though not properly authenticated, if it was accepted without objection into the record in adversary proceedings before a special inquiry officer. *Matter of O'Sullivan,* Int. Dec. No. 1294.

court or by inserting a notice in the local press. Moreover, no witnesses appeared. The court apparently considered no evidence except the *ex parte* statements of plaintiff's attorney. The court assumed defendant's concurrence because of his absence.

Under these circumstances, minimum standards of due process of law have not been met. Generally, before extending recognition to foreign judgments, our courts require the judgments to reflect satisfaction of such minimum standards. Even jurisdictions which authorize service by publication in their own proceedings generally require personal service upon a party as a condition for recognition of a foreign judgment.[19] Recognition and enforcement of foreign judgments on the basis of international comity are subject to much stronger inhibitions than applications of foreign law in general.[20]

Even if there is no question about the propriety of the judgment here, proceedings of the type underlying that judgment may be conducive to fraud or collusion. For our purposes—irrespective of formal requirements—the judgment adds little or no probative force to the other evidence of record bearing upon beneficiary's status as a divorced person.

The Puerto Rican Code of Civil Procedure—after providing specifically for foreign courts of admiralty and judgments against a specific thing—provides that in all other cases the judgment of any tribunal of a foreign country, having jurisdiction to pronounce the judgment, is presumptive evidence of a right between the parties and their successors in interest by a subsequent title, and can only be repelled by evidence of want of jurisdiction, want of notice to the party, collusion, fraud, or clear mistake of law or fact.[21] This provision derived from the California Code of Civil Procedure.[22] Such provisions indicate a legislative policy in favor of recognizing foreign judgments. Courts, however, in determining whether a particular judgment will be recognized, are apt to be guided by fundamental legal principles and to give effect to the legislative policy where application of the statutory directive would not conflict with those principles.[23] Moreover,

[19] *People v. Baker*, 76 N.Y. 78 (1870)—decree of divorce. *Hilton v. Guyot*, 159 U.S. 113 (1895). See also 3 Freeman, *Judgments* Secs. 1497—98 (5th Ed., 1925).

[20] Cheatham, Dowling, Goodrich, *Cases on Conflict of Laws* 274 (1936).

[21] Sec. 428, 32 L.P.R.A. Sec. 1800.

[22] Calif. Code of Civil Proc. Sec. 1915.

[23] Cf. *Lichtig v. Lichtig*, 81 P.R.R. 716 (1960) ; *Ponce v. F. Badrena and Hijos*, 74 P.R.R. 210 (1952).

See also, R. B. Perez Mercado, *Reconocimiento Validez y Medios para hacer Efectivas Sentencias Extranjeras en Puerto Rico*, 20 Rev. Jur. U.P.R. 345 (1951) ; Comment, "Recognition of Foreign Country Divorces: Is Domicile Really Necessary?" 40 Calif. L. Rev. 93 (1952) ; Note, "Recognition of Foreign Country Divorce Decrees in California," 2 Hastings L.J. 86 (1950).

the statutes recognize lack of jurisdiction and want of personal service as grounds for possible nonrecognition. We believe a court in Puerto Rico, regardless of any question of compliance with formal requirements of authentication and certification, would not give effect to the Qadi's judgment.

### IV. Validity of the Puerto Rican marriage

Generally, the Supreme Court of Puerto Rico relies upon the principle of nationality, rather than domicile or place of marriage, in choosing the law to be applied to determine the effect of a marriage.[24] The nationality rule applies most clearly where both spouses are citizens or both are noncitizens of Puerto Rico.[25] Moreover, the cases we have found applied the national law of the noncitizens not to the marriages themselves, which occurred outside Puerto Rico, but to the controversy's subject matter—located within Puerto Rico.

Apparently the application of the nationality principle where one spouse is a citizen and the other a noncitizen of Puerto Rico has not been authoritatively decided. Ordinarily, in such a situation we would expect the court to follow the husband's law—except for Puerto Rican requirements for the form of celebration of the marriage if the marriage occurred there. Quite clearly, however, a Puerto Rican court would not apply beneficiary's national substantive law, which recognizes polygamy.

We are positive, therefore, that, regardless of beneficiary's alien status, and regardless of his domicile, Puerto Rico would apply its own substantive law to the marriage which occurred there, especially since petitioner is Puerto Rican.

Marriage in Puerto Rico is a social institution, regulated and controlled by public authority.[26] Puerto Rican statutory provisions ex-

---

[24] *Cabassa* v. *Nadal*, 23 P.R.R. 691 (1916); *Antongiorgi* v. *Registrar of Property*, 6 P.R.R. 493 (1904); *Cothran* v. *Registrar of Arecibo*, 25 P.R.R. 602 (1917); *Los Conflictos De Leyes En Materia De Matrimonio, Inmuebles Gananciales y Divorcio Segun La Doctrina Puertorriquena*, 9 Rev. Jur. U.P.R. 95 (1939). For nationals of the United States the court applies a modified nationality doctrine referring to citizens of Puerto Rico or of the individual states.

In our jurisprudence the rule that the place of marriage governs the marriage's validity applies particularly to the celebration of the marriage whereas the law of the domicile frequently affects the validity of the resulting marital status. *Ex parte Suzanna*, 295 F. 713 (Mass., 1924).

[25] Cases cited *supra*[24].

[26] *U.S.* v. *Vega*, 3 P.R. Fed. 480 (1908); *Bravo* v. *Franco*, 1 D.P.R. 242 (1902); *Perez* v. *Leon*, 52 P.R.R. 496 (1938), *appeal dismissed* 99 F. 2d 851 (1938) *sub nom. Leon* v. *Torruella*.

Sec. 68, Civil Code, 1930, 31 L.P.R.A. Sec. 221, provides:-

Marriage is a civil institution, originating in a civil contract whereby a man and a woman mutually agree to become husband and wife and to discharge toward

pressly declare that a marriage not contracted and solemnized in accordance with the provisions of law is invalid.[27] The Civil Code of Puerto Rico also specifically provides that a marriage is invalid if contracted by a person who is already legally married.[28]

Moreover, the public attorney may bring an action for a declaration of nullity of a marriage.[29] The Puerto Rican Law of evidence contains a presumption that a man and woman deporting themselves as husband and wife have entered into a lawful contract of marriage, but that presumption may be overcome.[30] In any event, as we have seen, such a presumption is inapplicable here. A certified copy of a record of the civil registry constitutes only prima facie evidence of its contents and may be rebutted.[31]

Although the Puerto Rican Code provisions declaring the invalidity of marriages not complying with the statutory requirements are express and in mandatory terms, the courts have determined whether noncompliance with particular requirements of the statutes renders a marriage void ab initio or merely voidable. The Supreme Court of Puerto Rico, has held, however, that a marriage contracted by a person already legally married is void and not merely voidable.[32]

The Puerto Rican legislature and Judiciary have each expressed a strong public policy against marriage without termination of a prior marriage. Petitioner has not established that beneficiary has the legal capacity to contract marriage with her. Therefore, on the evidence here, the marriage between petitioner and beneficiary is not valid in Puerto Rico.

The petition depends upon the validity of that marriage. Therefore, it must fail. For the reasons discussed herein, we approve the district director's order denying the petition.

ORDER: It is ordered that the order of the district director denying the petition be, and hereby is, approved.

---

each other the duties imposed by law. It is valid only when contracted and solemnized in accordance with the provisions of law; and it may be dissolved before the death of either party only in the cases expressly provided for in this title.

[27] Among the requisites for validity of a marriage the Civil Code prescribes: * * * authorization and celebration of a matrimonial contract according to the forms and solemnities prescribed by law. Civil Code, 1930, Sec. 69(3), 31 L.P.R.A. Sec. 231(3).

When a marriage has not been contracted according to the requirements of this title, the same is null and void. Civil Code, 1930, Sec. 110. 31 L.P.R.A. Sec. 411.

[28] Civil Code, 1930, Secs. 69 and 70, 31 L.P.R.A. Secs. 231 and 232.

[29] Civil Code, 1930, Sec. 111, 31 L.P.R.A. Sec. 412.

[30] Code of Civil Proc., 1933, Sec. 464(29), 32 L.P.R.A. Sec. 1887(29).

[31] Code of Civil Proc., 1933, Sec. 433, 32 L.P.R.A. Sec. 1805: Estate of Felix Matos, 63 P.R.R. 72 (1944).

[32] Cruz v. Ramos, 70 P.R.R. 681 (1949).

## APPENDIX A

### Jordanian Law No. 92 of 1951 on Faimly Rights provides in part:

Art. 66—A husband of sound mind has the right to divorce his wife.

Art. 67—During a valid marriage, or during the *idda* period, a wife is subject to divorce. The wife whose marriage has been annulled is not subject to divorce even during the *idda* period.

Art. 68—A divorce pronounced under the influence of intoxication or compulsion is not valid.

Art. 69—Every husband is entitled to three pronouncements of divorce against his wife.

Art. 70—A contingent revocable repudiation conditioned on performing an act or refraining from performing such act is not valid.

Art. 71—A divorce is not valid unless the pronouncement of repudiation is addressed or directed to the wife.

Art. 72—Any pronouncement of repudiation made by number or number sign in excess of one shall be considered as one pronouncement only.

Art. 73—A wife may return to her husband after the first or second pronouncement, but after the third pronouncement she becomes irrevocably divorced.

Art. 74—Every divorce is revocable except: the one where repudiation has been pronounced three times; one made before consummation of marriage; one conditioned on a payable sum of money; and every divorce mentioned in this law as irrevocable.

Art. 75—A conditional divorce is valid.

Art. 76—A divorce pronouncement conditioned to become effective in the future is valid.

Art. 77—A complaint by the husband seeking a judicial divorce cannot be entertained unless the divorce is registered with the religious judge. However, any evidence presented to the court by the wife related to a divorce not initiated in the presence of the religious judge is accepted.

Art. 78—The revocable divorce does not dissolve the marriage tie immediately. The husband is entitled to his martial rights which can be displayed by statement or action during the *idda*. This right is irrevocable.

Art. 79—If a husband returns to his repudiated wife during her *idda* period, he preserves his marriage and his returning is not contingent on the wife's consent or on a new dower.

Art. 80—Any return intended for the future or made subject to a condition will not be valid.

Art. 81—The irrevocable repudiation terminates immediately the marital life. However, if the irrevocable repudiation was made by one or two pronouncements, the renewal of the marriage contract is not prohibited. If it was made after the third declaration, the prohibition is final.

Art. 82—The irrevocable divorce can be ended by the wife observing the *idda*, being lawfully married to another man, and the marriage consummated.